**UNITED STATES of America, Plaintiff–Appellee,**

v.

**$87,118.00 IN UNITED STATES CURRENCY and $3,490.00 in United States Currency, Defendants.**

**Appeal of: Abiodun Oloko.**

**No. 95–3158.**

United States Court of Appeals, Seventh Circuit.

Argued April 2, 1996.

Decided Sept. 4, 1996.

Cathleen Martwick (argued), Office of the United States Attorney, Criminal Division, Jack Donatell, Office of the United States Attorney, Civil Division, Chicago, IL, for the U.S.

William T. Huyck (argued), Chicago, IL, for Abiodun Oloko.

Before POSNER, Chief Judge, and RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

At the time of his arrest on heroin importation charges, Abiodun Oloko was found in possession of over $90,000 in United States currency. Mr. Oloko entered into a "proffer agreement" with the government. The terms provided that he would supply the government with information about heroin trafficking then under investigation. The government in turn agreed that the information supplied would not be used in the case-in-chief against Mr. Oloko or in aggravation of his sentence. Mr. Oloko pleaded guilty to the importation charge.

The United States, relying on information derived from Mr. Oloko's statements, later filed a complaint and supporting affidavit seeking the civil forfeiture of the currency. Mr. Oloko objected to the civil forfeiture proceeding on double jeopardy grounds and further contended that the government could not rely upon his "proffer statements." The district court overruled these objections and entered a judgment of forfeiture. Mr. Oloko now appeals from the judgment ordering the forfeiture of the currency and challenges the court's rulings. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

In the fall of 1991, Abiodun Oloko conspired to import heroin from the Philippines. On February 5, 1992, the DEA arrested Mr. Oloko in connection with the importation

scheme. At the time of his arrest, Mr. Oloko consented to a search of his car and of the apartment where he was arrested. The agents located and seized: (1) $87,118 cash in small bills from a shoebox found in the apartment; and (2) $3,490 cash in small bills from Mr. Oloko's car. No drugs were found. DEA Agent Owen Putnam, who had worked as an undercover agent in the conspiracy investigation, later testified that the barren apartment appeared to be a "stash pad"; it contained only a mattress, recliner chair and a few items of food and clothing. Agent Putnam further testified that, although no heroin was found, the agents believed the currency to be the proceeds of heroin trafficking.

In May 1992, Mr. Oloko was indicted for conspiracy to import heroin. At the time of the indictment, he and his attorney already had begun plea negotiations with the United States Attorney's Office and already had entered into the "proffer agreement" previously described. Pursuant to that agreement, Mr. Oloko told investigators that, from May 1991 to January 1992, he had engaged in a number of heroin transactions from which he had received $77,000 in cash. In June 1992, Mr. Oloko pleaded guilty to a conspiracy charge stemming from the Philippines importation scheme.

Nearly a year later, on May 24, 1993, the United States filed a complaint and supporting affidavit seeking forfeiture of the currency seized during Mr. Oloko's arrest. The complaint alleged that the defendant currency constitutes money furnished or intended to be furnished in exchange for a controlled substance or proceeds traceable to such an exchange. *See* 21 U.S.C. § 881(a)(6).[1] The complaint and supporting affidavit both mentioned Mr. Oloko's guilty plea, and the sup-

---

1. Section 881(a)(6) provides:
   (a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
   \* \* \*
   (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys,

negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

21 U.S.C. § 881(a)(6).

porting affidavit also recited the evidence that formed the basis of his criminal conspiracy prosecution. Mr. Oloko denied that the currency represents drug proceeds and, on June 2, 1993, filed a verified claim to the money.

On July 28, 1993, Mr. Oloko filed a motion in limine to suppress the information obtained by the government through his proffer statements. The district court rejected Mr. Oloko's contention that the use immunity granted by the plea agreement extended to the civil forfeiture proceeding. Even if it did, the court explained, the proffer information might tend to impeach or rebut Mr. Oloko's testimony at trial. Moreover, because Mr. Oloko had given the statements voluntarily and on the advice of counsel, there had been no violation of his Fifth Amendment right against self-incrimination.

On the eve of trial, Mr. Oloko filed a motion to dismiss the civil forfeiture action on double jeopardy grounds. He argued that the evidence establishing probable cause for the seizure of the currency is the same evidence that had supported his criminal prosecution. Mr. Oloko also filed a motion to preclude the government from relying on any evidence that it did not have at the time of the seizure. The district court denied each of these motions subject to post-trial reconsideration. The case proceeded to trial, and the government introduced evidence of Mr. Oloko's involvement in drug trafficking. The evidence presented at trial, derived from Mr. Oloko's proffer statements, detailed his involvement in drug transactions totaling more than $77,000.

Mr. Oloko testified that the drugs had been sold on a consignment basis and that he had received only a 10 percent sales commission on the transactions. He stated that the currency had come from his legitimate business, which involved purchasing automobiles at dealers' auctions and then reselling the vehicles in Nigeria. According to Mr. Oloko, he needed cash to purchase the automobiles at auction, and his customers in Nigeria also paid in cash, which he would exchange for U.S. currency. He explained that, at the time of his arrest, he recently had returned from Nigeria and that, shortly before his return, he had obtained $90,000 in U.S. currency from a Nigerian exchange. His trip had included selling automobiles belonging to Zekat Motors, Mr. Oloko explained, and he still owed that company $20,000. A former part-owner of Zekat Motors testified that Mr. Oloko had not yet paid the money that he owed to the dealership.

At the conclusion of the trial, the district court determined that the currency was subject to forfeiture under 21 U.S.C. § 881(a)(6). The court based its finding on the amount, type and location of the currency and on the fact that Mr. Oloko had admitted his involvement in drug trafficking. The court noted that, although "neither side offers an explanation that accounts for the [entire] $90,000," R.50, at 184, Mr. Oloko's inability to come up with a credible explanation for the $90,000 is circumstantial evidence that Mr. Oloko—a known drug trafficker—had derived the money from the drug trade.

Mr. Oloko submitted post-trial memoranda urging the district court to reconsider its earlier rulings on double jeopardy and on the government's use of the proffer statements. The district court denied these motions and entered judgment ordering forfeiture of the defendant currency. Mr. Oloko now appeals the various rulings of the district court.

## II

## DISCUSSION

### A.

Mr. Oloko first renews his contention that the forfeiture of drug proceeds under 21 U.S.C. § 881(a)(6) is "punishment" for purposes of double jeopardy. This claim is foreclosed by the Supreme Court's recent decision in *United States v. Ursery,* —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). In *Ursery,* the Supreme Court held that civil forfeitures under 21 U.S.C. § 881 are neither "punishment" nor criminal for purposes of the Double Jeopardy Clause. *Id.* at ——, 116 S.Ct. at 2149.

In reaching this conclusion, the Supreme Court applied the two-part test used in *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361

(1984). The Court considered (1) whether Congress intended proceedings under 21 U.S.C. § 881(a)(6) to be criminal or civil; and (2) whether forfeiture proceedings under 21 U.S.C. § 881(a)(6) are so punitive in fact as to "persuade us that the forfeiture proceeding[s] may not legitimately be viewed as civil in nature, despite Congress' intent." *Ursery,* —— U.S. at ——, 116 S.Ct. at 2147 (quoting *One Assortment of 89 Firearms,* 465 U.S. at 366, 104 S.Ct. at 1107). The Supreme Court concluded that, by creating "distinctly civil" procedures for forfeitures under 21 U.S.C. § 881, Congress has indicated clearly that it intended a civil, not a criminal sanction. *Id.* at ——, 116 S.Ct. at 2148. Turning to the second inquiry, the Court found little evidence, much less the "clearest proof" required by One Assortment of 89 Firearms, to suggest that forfeiture proceedings under section 881(a)(6) "are so punitive in form and effect as to render them criminal despite Congress' intent to the contrary." *Id.* at ——, 116 S.Ct. at 2148. On the basis of the Supreme Court's holding in *Ursery,* it is clear that the proceeding against the seized currency is neither "punishment" nor criminal; Mr. Oloko has not been placed in jeopardy a second time. *Id.* at —— 116 S.Ct. at 2149; *United States v. Kress,* 88 F.3d 664 (8th Cir.1996).

### B.

Mr. Oloko next submits that the government should not have been permitted to use the proffer statements to establish probable cause for the forfeiture. In his view, the district court erred in allowing the forfeiture to be predicated in part on these proffer statements because (1) that evidence was not available and therefore was not relied upon to justify the warrantless seizure of the currency; and (2) use of the statements violated Mr. Oloko's proffer agreement with the government. We shall examine each of these arguments in turn.

#### 1.

■ Mr. Oloko first submits that, because the government obtained the proffer information several months after the DEA agents seized the defendant currency, it should not have been permitted to rely on this evidence to establish probable cause for the forfeiture.

Acceptance of Mr. Oloko's view would require us to hold: (a) that the court should consider only evidence obtained up to the point at which the government institutes forfeiture proceedings, *see United States v. $191,910.00 in U.S. Currency,* 16 F.3d 1051 (9th Cir.1994); and (b) that a warrantless seizure amounts to "institution of such [forfeiture] suit or action" within the meaning of 19 U.S.C. § 1615. This court has yet to speak on either issue.

The first proposition advanced by Mr. Oloko currently divides the circuits that have found it necessary to rule on the matter. The First, Eighth and Ninth Circuits have held that 19 U.S.C. § 1615, which governs forfeiture proceedings under 21 U.S.C. § 881, limits the government's proof of probable cause to evidence that is obtained prior to the time that it institutes forfeiture proceedings.[2] The Second, Sixth and Eleventh Circuits have taken a different view.[3]

---

**2.** *See United States v. $191,910.00 in U.S. Currency,* 16 F.3d 1051, 1065–71 (9th Cir.1994); *United States v. Parcels of Property,* 9 F.3d 1000, 1004 (1st Cir.1993) (holding that the district court must consider whether the government had probable cause on the date that it instituted the forfeiture action); *United States v. $91,960.00,* 897 F.2d 1457, 1462 (8th Cir.1990) (stating that the court should only consider "evidence obtained up to the point at which the government institutes forfeiture proceedings").

**3.** *See United States v. Real Property Known and Numbered as Rural Route 1, Box 137–B, Cutler, Ohio,* 24 F.3d 845, 848 (6th Cir.1994) (holding that court " 'must examine the entire record, including evidence developed after the sei-

zure,' ") (quoting *United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280, 283 (6th Cir.1992)); *United States v. Premises and Real Property at 4492 S. Livonia Rd.,* 889 F.2d 1258, 1268 (2d Cir.1989) (holding that, although the government cannot start a forfeiture proceeding "in bad faith ... based on the hope that something will turn up to justify its suit, ... [o]nce a forfeiture proceeding is brought, if further evidence is legally obtained to justify the government's belief, there is no persuasive reason to bar its use"); *see also United States v. Daccarett,* 6 F.3d 37, 56 (2d Cir.1993) (noting that "[t]he machinery of our civil forfeiture laws permits the government to seize property without probable cause, institute a civil forfeiture proceeding, and then use civil discovery as a means of accessing information

In the present case, we have no occasion to take sides in this circuit conflict, a matter that no doubt will be resolved in due course by the Supreme Court of the United States. In the case before us, it is beyond dispute that the April and May 1992 proffer statements used by the United States to establish probable cause were acquired before the government began administrative forfeiture proceedings in June 1992 and filed its Verified Complaint for Forfeiture in May 1993. Therefore, a holding that the government may rely only on information obtained before the institution of proceedings does nothing to advance Mr. Oloko's position unless we adopt his second contention-that the agents' warrantless seizure of the currency, rather than the commencement of formal forfeiture proceedings in the district court, constitutes the "institution of such [forfeiture] suit or action" within the meaning of 19 U.S.C. § 1615. We cannot accept this second proposition.

Mr. Oloko's interpretation of 19 U.S.C. § 1615 requires us to consider that section in connection with 21 U.S.C. § 881(b), which addresses the seizure of property declared forfeitable in 21 U.S.C. § 881(a). Under section 881(b), property subject to forfeiture may be seized by the Attorney General "upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims." 21 U.S.C. § 881(b). However, seizure *without* judicial process is also authorized when, among other reasons, "the Attorney General has probable cause to believe that the property is subject to civil forfeiture under this subchapter." 21 U.S.C. § 881(b)(4). Notably, in the event of a seizure without judicial process, the government then must institute judicial proceedings under section 881(d) "promptly." 21 U.S.C. § 881(b).

We believe that the plain language of 21 U.S.C. § 881(b) prevents acceptance of Mr. Oloko's submission that the warrantless seizure of property pursuant to section 881(b)(4) constitutes the "institution of such [forfeiture] suit or action" within the meaning of 19 U.S.C. § 1615. The language chosen by Congress in section 1615 to define the critical juncture—the "institution" of a "suit" or an "action"—describes the commencement of formal judicial proceedings. Similarly, 21 U.S.C. § 881(b) recognizes a sequential distinction between the warrantless "seizure" and the proceedings that must be "instituted" promptly thereafter. *See* 21 U.S.C. § 881(b).[4]

### 2.

■ We now turn to Mr. Oloko's second challenge to the government's use of his proffer statements to justify the forfeiture. He submits that the government's use of these statements violated his proffer agreement with the government and deprived him of his Fifth Amendment rights of due process and against self-incrimination.

■ As a general proposition, pre-trial agreements such as cooperation and proffer agreements are interpreted according to principles of contract law. *United States v. Liranzo*, 944 F.2d 73, 77 (2d Cir.1991). When the terms of a contract are unambiguous, the intent of the parties is discerned from the four corners of the contract. *Id.* When the contract is ambiguous on its face because a contractual provision is open to more than one interpretation, extrinsic evidence is admissible to determine the meaning of the ambiguous term. *See United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir.1992), *cert. denied*, 507 U.S. 997, 113 S.Ct. 1616, 123 L.Ed.2d 176 (1993). Of course, it must al-

---

necessary to effect a forfeiture"), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994). We note that, in *$191,910.00 in U.S. Currency*, the Ninth Circuit has suggested that there is some ambiguity in the Eleventh Circuit's position. *See* 16 F.3d at 1070 n. 38 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1439 & n. 24 (11th Cir.1991) (en banc)).

**4.** As noted in the text, section 881(b) requires that judicial proceedings be instituted "prompt-

ly" after a warrantless seizure. On appeal, Mr. Oloko disclaims any intent to rely solely on the "promptness" requirement of 21 U.S.C. § 881(b) other than in support of his interpretation of 19 U.S.C. § 1615. *See* Reply Br. at 5 ("The requirement that formal proceedings be 'instituted promptly' after a warrantless seizure is cited merely as support for [Mr. Oloko's] interpretation [of section 1615]."). We therefore have no need to review the district court's ruling on this issue.

ways be remembered that the contract is part of an ongoing criminal proceeding. Therefore, as Judge Coffey recently noted for the court in the context of plea agreements, such agreements are " 'unique contracts and the ordinary contract principles are supplemented with a concern that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause.' " *United States v. Rourke,* 74 F.3d 802, 805 (7th Cir.) (quoting *Ingram,* 979 F.2d at 1184), *cert. denied,* — U.S. —, 116 S.Ct. 1840, 134 L.Ed.2d 942 (1996). Such concerns are also appropriate, of course, in the context of proffer agreements.

After his arrest on importation charges, Mr. Oloko agreed to cooperate with the government and, on March 16, 1992, entered into a written proffer agreement with the U.S. Attorney's office. The opening sentence of the letter recites that the government is investigating allegations of criminal wrongdoing involving heroin trafficking. The agreement then provides that, in exchange for Mr. Oloko's cooperation in "this matter," the government would not use his statements in "the government's casein-chief, or in the aggravation of [Mr. Oloko's] sentence." R.19, Ex.A, at 1. The government was free to pursue any investigative leads deriving from Mr. Oloko's statements, and the agreement specifically contemplated that such leads "could result in the acquisition of evidence admissible against [Mr. Oloko] in subsequent proceedings." *Id.* The agreement also contained the following language:

> This letter embodies the entirety of the agreement to make a proffer. No other promise or agreement exists between you or your client and this office regarding the proffer. Specifically, the government intends to proceed in the prosecution of your client, in *United States v. Oloko,* No. 92 CR 85, and the government makes no promises to your client, Abiodun Oloko, regarding the disposition of the charges against him in that case.

*Id.* at 1–2. However, the proffer agreement did not specifically address the possibility of a subsequent civil forfeiture proceeding.

Taking the letter in its entirety, the district court decided that the proffer agreement does not contemplate a civil forfeiture proceeding and that the agreement could "only be read as pertaining to the Government's criminal case" against Mr. Oloko. R.25, at 5. The court found significant the fact that, at the time the parties entered into the agreement, the present civil forfeiture action had not yet been filed. In any event, the court noted, even if the proffer agreement does cover the forfeiture action, the substance of Mr. Oloko's proffer would still be admissible because Mr. Oloko had taken a position contrary to his earlier proffer when he claimed that the money sought to be forfeited was the working capital of his legitimate business.

On appeal, Mr. Oloko renews his contention that the proffer agreement ought to be read to extend use immunity to civil forfeiture proceedings.[5] Nothing in the agreement limits the scope of the government's promises to a criminal prosecution, he asserts, and the agreement's references to "this matter" and to "the government's case-in-chief" can be read to refer to any proceedings growing out of the investigation of criminal wrongdoing recited in the letter. At the very least, he urges, the agreement is ambiguous with respect to its applicability to the present proceeding and ought to be construed against its drafter, the government.

We agree with the district court that the proffer agreement is not ambiguous and that, when read as a totality, the government's promise of use immunity did not extend to an as-yet-unfiled civil forfeiture action. Read in context, the references to "this matter" and to the government's "case-in-chief" refer only to the criminal case pending against Mr. Oloko. The agreement expressly contemplates the use of evidence derived from investigatory leads in "subsequent proceedings," and the only mention of

---

5. Mr. Oloko also submits that he was induced to waive his Fifth Amendment privilege against self-incrimination because he was "tricked" into waiving those rights without a full appreciation of the implications of the waiver. This contention is without merit. There is no dispute that Mr. Oloko made the proffer statements voluntarily and on the advice of counsel.

the government's "case-in-chief" appears in conjunction with the promise not to use the substance of the proffer agreement in aggravation of Mr. Oloko's sentence, an event that could occur only in the context of the criminal prosecution. Significantly, moreover, the final substantive paragraph of the agreement is logically and practically read as limiting and defining the scope of the government's promise with respect to Mr. Oloko's criminal case, mentioned by caption and number. Read in its entirety, therefore, the proffer agreement extends use immunity only to the criminal prosecution of Mr. Oloko; it contains no other promises by the government.[6]

### C.

Under the forfeiture provision of the Comprehensive Drug Abuse Prevention & Control Act of 1970, 21 U.S.C. § 881, property used to commit a violation of the Act, including proceeds traceable to drug trafficking, is subject to forfeiture. *See* 21 U.S.C. § 881(a)(6). The procedures and standard of proof employed in forfeiture proceedings are well established. The government, as the party seeking the forfeiture, has the initial burden of establishing probable cause to believe that the property is subject to forfeiture. *United States v. All Assets and Equipment of West Side Building Corp.*, 58 F.3d 1181, 1187 (7th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 698, 133 L.Ed.2d 656 (1996); *United States v. $94,000 in U.S. Currency*, 2 F.3d 778, 782 (7th Cir. 1993). To discharge this burden, the government must establish a "reasonable ground for the belief of guilt supported by less than prima facie proof but more than mere suspicion." *All Assets*, 58 F.3d at 1188. Probable cause for forfeiture exists if the government demonstrates a nexus between the seized property and illegal drug activity. *Id.* at 1188 & n. 13; *United States v. Certain Real Property, Commonly Known as 6250 Ledge Rd.*, 943 F.2d 721, 725 (7th Cir.1991).

Once the government has met its burden of establishing probable cause, "the ultimate burden shifts to the claimant to prove by a preponderance of the evidence that the property is not subject to forfeiture." *All Assets*, 58 F.3d at 1189 (quoting *$94,000 in U.S. Currency*, 2 F.3d at 782–83). If the claimant fails to rebut the government's proof, the government's showing of probable cause, standing alone, will support a judgment of forfeiture. *Id.; United States v. On Leong Chinese Merchants Ass'n Bldg.*, 918 F.2d 1289, 1292 (7th Cir.1990), *cert. denied*, 502 U.S. 809, 112 S.Ct. 52, 116 L.Ed.2d 29 (1991). In reviewing a forfeiture proceeding, we must accept the district court's factual findings in support of its conclusion that the government demonstrated probable cause unless those findings are clearly erroneous. *United States v. Thirty–Nine Thousand Eight Hundred Seventy–Three and No/100 Dollars ($39,873.00)*, 80 F.3d 317, 319 (8th Cir.1996). As a mixed question of law and fact, however, the district court's determination of probable cause is subject to de novo review. *Id.; United States v. One 1987 Mercedes 560 SEL*, 919 F.2d 327, 330 (5th Cir.1990); *United States v. Padilla*, 888 F.2d 642, 643 (9th Cir.1989); see also *Ornelas v. United States*, — U.S. —, —– —–, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996).

Applying these standards to the case before us, we must conclude that the government has established probable cause to believe that there is a nexus between the currency seized by the agents and Mr. Oloko's drug activity. In its "Verified Complaint for Forfeiture," the government recited the fact of Mr. Oloko's conviction on drug importation charges. *All Assets*, 58 F.3d at 1189 ("Evidence of prior convictions for drug possession or trafficking is certainly admissible in a probable cause determination."). The government also presented direct evidence, derived from Mr. Oloko's proffer statements, of his involvement in other drug transactions,

---

**6.** Although we conclude that the proffer agreement in this case limited the scope of the use immunity accorded Mr. Oloko to the criminal proceeding, we join our colleague in the district court in his suggestion that the contingency of civil forfeiture proceedings be covered explicitly in agreements such as this one. The government easily could have avoided the time and expense of added litigation by addressing explicitly the possibility of future forfeiture proceedings in the proffer agreement.

totaling approximately $70,000, over a two-year period. The amount, denomination and location of the currency seized by the agents is also suspicious. The agents found $87,118 in currency, in small denominations, in a shoe box in Mr. Oloko's apartment. *Cf. United States v. $67,220.00,* 957 F.2d 280, 285 (6th Cir.1992) (recognizing that, although the presence of a large sum of cash is not sufficient, standing alone, to establish probable cause for forfeiture, "carrying a large sum of cash is strong evidence of some relationship with illegal drugs"). One of the agents on the scene described the apartment as an apparent "stash pad"; it contained only a mattress, recliner chair, and a few items of food and clothing. In addition, the agents recovered, from Mr. Oloko's automobile, $3,490 in currency, also in small denominations. Because this evidence, taken together, provides a "reasonable ground for the belief of guilt supported by less than prima facie proof but more than mere suspicion," *All Assets,* 58 F.3d at 1188, we must conclude that the government has discharged its burden of establishing probable cause.

■ The burden then shifted to Mr. Oloko to demonstrate that the currency seized by the agents does not have the requisite connection to drug activity. Mr. Oloko claims to have presented convincing evidence that accounts for the presence of such a large amount of cash in the apartment: a legitimate, cash-based business selling automobiles in Nigeria. He also attempted to explain the barren appearance of his apartment. According to Mr. Oloko, he had rented the apartment only three weeks earlier, after returning from his trip to Nigeria; he was living with a friend at the time and was moving into his new apartment gradually. The inference that the apartment was a "stash pad," he asserts, is refuted by the fact that no drugs were found at that location. Mr. Oloko also attacks the evidence presented by the government to establish probable cause for the forfeiture. Although the government introduced evidence that he had engaged in drug transactions totaling approximately $77,000, his own unrefuted testimony, Mr. Oloko asserts, established that he received only a 10 percent commission on these transactions. Significantly, he

adds, the government-supplied "buy money" used in a number of these transactions was not among the currency seized. Accordingly, he concludes, the government has accounted for only a small percentage of the currency seized from his apartment and automobile.

The district court determined that Mr. Oloko failed to prove, by a preponderance of the evidence, that the currency seized by the agents was not the proceeds of drug transactions and, accordingly, held that the currency is forfeitable under 21 U.S.C. § 881(a)(6). The district court noted, correctly, that neither the government nor Mr. Oloko introduced direct evidence accounting for the entire amount of currency seized by the agents. Both sides must therefore argue that the circumstantial evidence supports their view.

The district court heard conflicting testimony concerning the profits from Mr. Oloko's business. Mr. Oloko testified that he made between $5,000 and $10,000 profit on each car that he sold in Nigeria. However, he did not provide any evidence documenting, for even one automobile, the purchase price in the United States and the corresponding sales price of that same automobile in Nigeria. The district court also heard from Olusesam Akinsayna, a former business associate of Mr. Oloko. Akinsayna testified to a lower per-car profit margin than Mr. Oloko. Specifically, he testified that, in Nigeria, the per-car profit depends upon the make and model of the car being sold: The sale of a Lexus would result in a profit of between $5,000 and $7,000, but the sale of a small Toyota would yield a profit of around $1,000. Confronted with this conflicting evidence, the district court made an express credibility determination, finding Akinsayna's testimony more credible on the issue of profitability. The court noted that, on his account, "it is extremely unlikely that the sales we know about could account for $90,000. It is more likely that they would account for only a small fraction of the $90,000." R.50, at 189.

The district court was not persuaded by Mr. Oloko's explanation that he kept $87,000 in small bills at his barren apartment be-

cause he needed the cash available to purchase cars. *See $67,220.00,* 957 F.2d at 285; *United States v. $215,300 in U.S. Currency,* 882 F.2d 417, 419 (9th Cir.1989) (noting that claimant's possession of an extremely large amount of cash is itself "strong evidence that the money was furnished or intended to be furnished in return for drugs"), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990). It noted that Mr. Oloko had more than three weeks to complete the move into his supposedly "new" apartment, and the evidence showed that Mr. Oloko could have used money orders instead of cash to purchase the automobiles at auction. Under these circumstances, and in light of the fact that Mr. Oloko recently had been robbed of $20,000 in cash, it was highly unlikely that he would keep such a large amount of currency in a location where he was not residing at the time. Nor was the court persuaded by Mr. Oloko's explanation that the currency was in small denominations because he could realize a better exchange rate in Nigeria with small bills; it was at least equally likely that the small denominations reflect the typical currency of street drug transactions.

Upon review of the record and with due regard for the credibility determinations made by the district court, we have no reason to disagree with the district court that Mr. Oloko has failed to prove, by a preponderance of the evidence, that the currency seized is not forfeitable under 21 U.S.C. § 881(a)(6). Simply put, Mr. Oloko has failed to meet his burden of establishing, by a preponderance of the evidence, a credible explanation for the money. *Cf. United States v. Edwards,* 885 F.2d 377, 390 (7th Cir.1989) ("[W]here a defendant's verifiable income cannot possibly account for the level of wealth displayed and where there is strong evidence that the defendant is a drug trafficker, then there is probable cause to believe that the wealth is either a direct product of the illicit activity or that it is traceable to the activity as proceeds."). We therefore uphold the district court's determination that the forfeiture sought by the government is supported by probable cause.

## Conclusion

Accordingly, the judgment of the district court is affirmed.

**AFFIRMED.**